John Lewis BURNEY, Appellant,

v.

STATE of Indiana, Appellee.

No. 02S00–8811–CR–924.

Supreme Court of Indiana.

June 5, 1990.

Bruce R. Snyder, Deputy Public Defender, Fort Wayne, for appellant.

Linley E. Pearson, Atty. Gen., Preston W. Black, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in a conviction of appellant of Murder, for which he received a sentence of forty (40) years with ten (10) years suspended.

The facts are: On September 20, 1987, appellant and the victim had engaged in a fight in which the victim threw appellant to the ground and beat him, leaving him with his eyes swollen and bleeding. He received treatment from a physician for his injuries.

In the early morning hours of September 25, 1987, appellant and the victim were in a "drug house" in Fort Wayne. They were smoking cocaine with at least six other individuals. Appellant and the victim began arguing. Witnesses observed that appellant had a small black pistol in his waistband. During the argument, both men were ejected from the house at the request of Phillip Thomas.

The men continued to argue outside the house. During this time, James Sims had parked his car across the street from the house and had started walking in that direction when he saw the victim and the appellant and noticed that appellant was holding a pistol in his hand.

Appellant was standing in the yard below the porch and the victim was standing on the porch. Sims then heard two gunshots and saw the victim spin around and hit the side of the house. The victim then crouched and held himself. Sims retreated to his car and drove a short distance down the street. While doing so, he observed appellant as he approached the porch and fired his gun three more times at the victim who was lying on the porch.

Persons inside the house also heard the gunshots and at first took cover. Thomas, who worked at the drug house, apparently believed that the house was under attack and fired shots from a .380 automatic pistol. When the shooting stopped, the persons inside the house began to flee. Because the victim's body was partially blocking the doorway, they tore the screen from the door and exited over the victim's body.

Howard Seidel, who resided across the street, was awakened by the shots and observed persons fleeing from the house. He immediately called the police, who arrived shortly and found the victim's body on the porch. Inside the house, the police found three expended cartridges, which apparently had been fired from Thomas's gun. Four bullets were recovered from the victim's body and a fifth bullet was found behind the couch in the house.

Testimony was that in all probability all five of these bullets were fired from appellant's pistol. Two bullets travelled laterally through the victim's body; one, which was apparently the fatal shot, entered the victim's navel and severed his aorta. The second lateral shot entered the victim's buttock. One bullet entered the left eye and traversed the body in a general longitudinal direction; another bullet entered just

below the right eye, and travelled in a longitudinal direction. A fifth bullet had entered and exited the victim's left ankle. This was apparently the bullet found behind the couch in the house.

Appellant claims there is insufficient evidence to support the verdict of the jury. He bases his contention largely upon the testimony of the doctor who performed the autopsy and described the paths taken by the bullets that entered the victim's body.

Appellant takes the position that because Sims had testified that appellant was standing on ground level and the victim was standing on the porch, which was some thirty-eight inches above ground level, when the first two shots were fired, it would have been impossible for those shots to have taken a lateral path through the victim's body but by necessity they would have taken an upward path, and because the victim was standing at the time the first two shots were fired, the shots entering his eyes and traversing longitudinally downward through the body could not have been the first two shots.

Appellant's hypothesis would be correct if one assumes the victim was standing absolutely erect at the time the first two shots were fired. However, there is no such evidence in this record. It is obvious that if the victim was in a stooped position at the time the first two shots were fired, they could have easily traversed the path described by the doctor.

Appellant also takes the position that because the photographs placed in evidence show the victim lying with his head against the door, two of the three subsequent shots could not have entered his eyes and travelled downward through his body if appellant, as Sims testified, was standing at the front of the porch. Here again, there is no evidence in this record from which one can positively deduce the position of the victim's body at the time the last three shots were fired. The most that Sims could say was that he observed the victim in a crouched position after the first two shots were fired.

The facts that are positive in this case are that the victim and appellant had engaged in an argument inside the house, that they had been evicted from the house, that they had continued their argument on the porch, that appellant was known to be armed, that shots were heard while the argument was still in progress immediately outside the house, and that while appellant was present the victim suffered fatal gunshot wounds. It was the prerogative of the jury to weigh this evidence and determine whether appellant was responsible for the victim's death beyond a reasonable doubt. *Bieghler v. State* (1985), Ind., 481 N.E.2d 78.

Appellant's attempt to argue positioning of the victim's body so as to make it impossible for the shots to have occurred in the manner described by Sims is not sufficient to cause us to reevaluate the evidence and to find no evidence of probative force to sustain the conviction.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, PIVARNIK and DICKSON, JJ., concur.